# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

ANDRE VERLIN ANDERSON,                    Case No. 17-CV-4480 (WMW/FLN)

                Petitioner,

v.                                        **REPORT AND RECOMMENDATION**

VICKI JANSSEN, Warden,

                Respondent.

---

Andre Verlin Anderson, pro se; Robert H. Meyers and Katherian D. Roe, Office of the Federal Defender, for petitioner.[1]

Rebekka L. Stumme, St. Louis County Attorney's Office, for respondent.

***

Petitioner Andre Verlin Anderson has filed a petition for a writ of habeas corpus governed by 28 U.S.C. § 2254. The petition has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. Based on that review, this Court recommends that Anderson's habeas petition be granted.

## I. BACKGROUND

The Minnesota Court of Appeals summarized the facts of Anderson's case as follows:

---

[1] The Office of the Federal Defender was appointed to represent Anderson on Ground Two of his petition for a writ of habeas corpus. This Court expresses its gratitude to the appointed attorneys for their service.

On August 19, 2014, [victim Chad Johnson] was contacted by a friend, whom he knew only as "Steve," who asked [Johnson] to meet him at a Subway restaurant in Duluth. "Steve," later identified as Steven Hager, was looking for marijuana and [Johnson] did not have any. [Johnson] gave him the phone number of a mutual acquaintance, J.H-S. Later, Hager called [Johnson] to ask for a ride. [Johnson] met Hager and another man, whom Hager described as his boyfriend, at the Subway. [Johnson] had never met the other man.

[Johnson] was driving a pickup truck; Hager sat in the front seat, and his companion sat in the back seat. [Johnson] could see them "decently" because of a street light and the dome light in his pickup. Hager's companion was about six feet tall, had a beard, was "skinny," and was wearing a black hooded sweatshirt.

The two men gave [Johnson] directions on where to drive, ostensibly to find a cigarette pack with drugs in it. On a dark stretch of road, the three men got out to search for the cigarette pack using a flashlight from [Johnson]'s phone. Hager's companion called [Johnson] over and while [Johnson] was looking on the ground for the cigarette pack, the other man stabbed him a total of 12 times. As the man backed away, [Johnson] ran away from the truck and hid in a ditch. After the two men left in his truck, [Johnson] approached a house with a light and asked for help. [Johnson]'s injuries included a lacerated liver, lacerated kidney, and a punctured lung. [Johnson] told police before the ambulance came that he had been with "Steve" and another man he did not know, and that this second man had stabbed him. He told the homeowner that his friends had tried to kill him. [Johnson]'s truck was later found in a vacant lot in Duluth; the truck had been largely destroyed by fire.

At the hospital, [Johnson] initially gave police no description of Hager or his friend, could provide only a partial address for Hager, and could not remember Hager's telephone number. But he stated that it was "Steve's" friend who assaulted him. [Johnson]'s mother was contacted by J.H-S., who knew Hager's last name and where he lived. J.H-S. drove with police to point out Hager's residence. J.H-S. had seen Hager

2

earlier on the day of the assault with a man whom he described as "a thinner male with a scruffy face or scruffy beard." Later, J.H-S. gave police a phone number that he said Hager had used to contact him. The number was listed to appellant Andre Verlin Anderson.

Police returned to the address pointed out by J.H-S. and spoke with Hager. Hager admitted that he and Anderson had been picked up by [Johnson] the night before. The owner of the house where Hager lived, J.F., said that Hager had been renting a room at her house and that Anderson visited a few times because "Steve was dating him." She testified that Anderson had been at her house with Hager on August 19. Her son, T.F., knew Hager well and had met Anderson, whom he described as Hager's boyfriend. He agreed that Anderson had been with Hager during the day on August 19. When police located and arrested Anderson, he had T.F.'s identification card in his wallet.

Police showed [Johnson] a six-person photo lineup that included Anderson's 2011 booking photo. [Johnson] was unable to identify anyone in the first photo lineup. After Anderson was arrested, police noted that he looked different from his 2011 photograph, in which he had short hair and was clean-shaven. Police used Anderson's new booking photo to assemble another six-person photo lineup. When shown the second lineup, [Johnson] identified Anderson as his assailant. [Johnson] also picked Hager out of a third photo lineup.

Hager pleaded guilty to arson, aiding and abetting arson, and aggravated robbery. As part of his plea, he agreed to testify against Anderson, although he was worried about testifying because he was in prison. Anderson had overdosed, and Hager picked him up from the hospital on August 19. Hager testified that after spending the day together, he and Anderson went to Subway to meet [Johnson]. At this point in the testimony, Hager refused to testify and was threatened with contempt. Hager returned later to complete his testimony. Hager said he and [Johnson] chatted as they drove, while Anderson was in the back seat. Anderson indicated where they should stop to look for a cigarette pack with drugs. The three men looked for the pack; Hager was standing by the truck when he saw Anderson stab [Johnson]. Hager was

3

roughly 15 feet away, and the truck headlights illuminated the area. Hager was frightened and got in the truck. Anderson jumped in the passenger side, and Hager "took off." The men planned to drive the truck into Lake Superior, but decided to burn the truck instead. Hager and Anderson drove to a vacant lot, put charcoal in the cab, and lit the truck on fire. Anderson instructed Hager to leave the windows open. During his testimony, defense counsel impeached Hager with evidence of his plea agreement.

In pretrial motions, Anderson's attorney offered the testimony of an expert on the drawbacks of eyewitness identification. The district court refused to permit the expert to testify and, when the motion was later renewed during the trial, the district court again refused to permit the witness to testify.

The jury found Anderson guilty of aiding and abetting attempted second-degree murder, aiding and abetting first-degree assault, and aiding and abetting motor-vehicle theft, and acquitted him of aiding and abetting third-degree arson.

*State v. Anderson*, Nos. A16-0565 and A16-0880, 2017 WL 1157882, at *1-2 (Minn. Ct. App. Mar. 27, 2017) (footnote omitted).

Anderson raised a variety of challenges to his conviction in the state courts; only six are relevant for purposes of this Recommendation:

*First*, Anderson argued that "the district court abused its discretion by refusing to strike a juror for cause after the juror stated that she would like to hear both sides of the story and that she thought 'we should all speak for ourselves, especially when we're defending ourselves.'" *Id*. at *2. According to Anderson, the juror had demonstrated bias by indicating that she would hold against him any invocation of his Fifth Amendment right to avoid self-incrimination at trial and had not been adequately rehabilitated of that bias by later questioning.

4

*Second*, Anderson argued that the photograph-lineup procedures used by police when questioning victim Johnson were unduly suggestive. *See Anderson*, 2017 WL 1157882, at *4-5  Johnson was shown two arrays that included Anderson's photograph, with only Anderson's picture appearing in both of those arrays; Johnson failed to identify Anderson in the first array, but did pick him out of the second. Anderson argued that Johnson had not recalled his visage from the scene of the crime but merely remembered while viewing the second array that Anderson had appeared in the first array as well and therefore must be the suspect.  Further, argued Anderson, his photograph in the second lineup differed somewhat from the other pictures, being cropped more tightly and lacking in clarity.  Finally, Anderson argued that the officers conducting the lineup varied in other respects from best practices, as demonstrated by the fact that St. Louis County soon thereafter enacted policies regarding photographic lineups that differed from the procedures used in Anderson's case.

*Third*, Anderson argued that the trial court prevented him from presenting a complete defense, and thereby violated his federal constitutional rights, "by refusing to permit expert testimony about the shortcomings of eyewitness identification." *Id*. at *5. The trial court had concluded that the proffered testimony "would unduly prejudice the State because it would unfairly create an aura of special reliability and trustworthiness for purported expert testimony that is actually nothing more than common sense and common knowledge challenges to eyewitness identification testimony, already available to lay jurors." *Id*.

5

*Fourth*, Anderson argued that the trial court "deprived him of his constitutional right to a fair trial by refusing to let him produce evidence of prior plea negotiations that the state had with co-defendant Hager." *Anderson*, 2017 WL 1157882, at *7. Evidence of the final plea *agreement* entered by Hager was introduced at trial, but not evidence of the *negotiations* that preceded that agreement; Anderson contends that the exclusion violated his federal constitutional rights.

*Fifth*, Anderson argued that the district court should not have allowed the prosecution to recall Hager as a witness after Hager had stopped responding to questioning when first placed on the stand. *See id.*

*Sixth*, Anderson argued that the district court erred in denying his motion for an acquittal, as the evidence at trial (he says) was insufficient to convict. *See id.*

Those arguments now encompass the six grounds for relief presented in Anderson's petition for a writ of habeas corpus. *See* Petition at 5-24 [ECF No. 1]. Each claim was rejected by the Minnesota Court of Appeals on its merits; the Minnesota Supreme Court declined review of the case. For the reasons explained below, this Court concludes that the decision of the Minnesota Court of Appeals regarding the admission of witness Johnson's photo ID of Defendant was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). Accordingly, this Court recommends granting Anderson's habeas corpus petition. The court rejects all of Anderson's other claims.

## II. ANALYSIS

### A. *Standard of Review*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this Court's review of Anderson's habeas corpus petition.  The relevant portion of AEDPA, 28 U.S.C. § 2254(d), provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor*, 529 U.S. 362 (2000), the United States Supreme Court discussed § 2254(d)(1) and how it should be applied by the federal district courts.  The Supreme Court recognized that

> a state-court decision can be "contrary to" this Court's clearly established precedent in two ways.  First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law.  Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Id*. at 405.

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme]

Court's decisions but unreasonably applies that principle to the facts of the prisoner's

case." *Id*. at 413. The Supreme Court also explained that

> [a] federal habeas court making the "unreasonable
> application" inquiry should ask whether the state court's
> application of clearly established federal law was objectively
> unreasonable. . . . [A] federal habeas court may not issue the
> writ simply because that court concludes in its independent
> judgment that the relevant state-court decision applied clearly
> established federal law erroneously or incorrectly. Rather,
> that application must also be unreasonable.

*Id*. at 409, 411.

A writ of habeas corpus may also be available where the state court's resolution of

a prisoner's criminal case is "based on an unreasonable determination of the facts in light

of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In

other words, habeas relief can be granted if the conviction is based on findings of fact

that could not reasonably be derived from the state court evidentiary record. When

reviewing a state court decision, however, "a federal court . . . presumes that the state

court's factual determinations are correct; this presumption may be rebutted only by clear

and convincing evidence." *Lee v. Gammon*, 222 F.3d 441, 442 (8th Cir. 2000). In

addition, 28 U.S.C. § 2254(e)(1) provides that

> [i]n a proceeding instituted by an application for a writ of
> habeas corpus by a person in custody pursuant to the
> judgment of a State court, a determination of a factual issue
> made by a State court shall be presumed to be correct. The
> applicant shall have the burden of rebutting the presumption
> of correctness by clear and convincing evidence.

"AEDPA . . . imposes a highly deferential standard for evaluating state-court

rulings and demands that state-court decisions be given the benefit of the doubt."

8

*Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations and quotations omitted).  Habeas relief

cannot be granted unless the petitioner has identified and substantiated a specific error

committed by the state courts.  Moreover, the petitioner must show that the state courts

committed the type of error that is actionable under § 2254, as that statute has been

interpreted by the Supreme Court.  Finally, the petitioner "must show that the state

court's ruling on the claim being presented in federal court was so lacking in justification

that there was an error well understood and comprehended in existing law beyond any

possibility for fairminded disagreement."  *Harrington v. Richter*, 131 S. Ct. 770, 786-87

(2011).

### B.  Ground One – Juror Bias

The following colloquy took place during voir dire:[2]

> DEFENSE: Let's talk about the presumption of innocence.
> Mr. Anderson, the law presumes Mr. Anderson is innocent.
> He does not have to prove his innocence.  The State has the
> only burden.  We've talked about this already.  It's an
> important concept.  As important as that concept are the rights
> that are attached to Mr. Anderson's right to be here today.
> Obviously, he has a right to a jury trial.  He's here because of
> that.  He also has a right to remain silent. . . .
>
> Has anybody here ever . . . had to listen to either two children,
> or maybe two people on a team, or people, co-workers at
> work, something happens and you have to listen to both sides,
> right?  And you have to make a decision.  That's not what's
> going happen [sic].  It's not the law.  It's not the law here.
> The inference in what those situations is is that you're
> listening to both sides, that both sides have to say what
> happened.  Again, the State has the only burden.

---

[2] The names of both the defense counsel and the prosecutor throughout this passage have
been replaced by "DEFENSE" and "PROSECUTOR," respectively.  These alterations are
not indicated by brackets in the above quotation.

Mr. Anderson has zero burden. He does not have to say a thing. He does not have to testify. Does not have to provide any witnesses. Nothing. So you would not be, if Mr. Anderson chose not to testify. If his attorneys advised him not to testify, or for any reason he was not on that stand, you would not be hearing from Mr. Anderson. And the State, the law allows for that. The law is absolutely clear. Is there anyone here, anyone here, keep this in mind, because this is a question that's very important. Is there anyone here who feels that they would have to hear from Mr. Anderson before they could render a verdict of not guilty? (No response) Now I want you to think about that for a second. Would you say, look, I would want to hear from Mr. Anderson. I would need to know his side of the story. Is there anybody who feels that way, they could not enter a not guilty without hearing from Mr. Anderson first? Ms. [Juror?] . . .

THE JUROR: Yeah, I would need to hear both sides.

DEFENSE: Okay. And that's fair for you to say that, because quite honestly, you're not alone in the world. There are a lot of people who feel that they would need to hear both sides.

THE JUROR: Yes.

DEFENSE: But, what if the Court told you, and if you were selected as a juror the Court would tell you, that the defense does not have to put on a side and that you are not to have that question in your mind when you're going back to the jury room? Would you be able to set that aside and say, okay, well, the Court told me not to do it, or would that be on your mind?

THE JUROR: I don't know.

DEFENSE: Do you think you would — so what you're saying to me is, what I'm hearing is that you would not be able to put aside the fact that you did not hear from Mr. Anderson and that could affect your ability to make a fair and impartial decision?

THE JUROR:  I think we should all speak for ourselves, especially when we're defending ourselves.

DEFENSE:  Okay.  And thank you for saying that because remember that defendant is not defending himself.  He does not have attorneys defending him.  He has the State prosecuting him, and the State has the only burden.  So it's not to think of what the defense is doing or what the defendant has done to defend himself, but rather what the prosecution, they have brought the charges against Mr. Anderson.  That is why they, the State, have the only burden.

So, now, does — I really appreciate Ms. [Juror], you bringing, you discussing this with me.  Is there anybody here after hearing Ms. [Juror] say that think that maybe they think the same way? . . .

What if the Court told you, what if the Court told you that you cannot think of that?  You have to set that thought aside?  You cannot hold Mr. Anderson to expecting to hear from him, because then it's not what is required.  What is required is the State must prove the case.  The defense has no case that they have to prove or provide.  Would you not be able to set it aside? . . .

And Ms. [Juror], I heard that you would have difficulty setting it aside?

THE JUROR:  I believe that I would, yes.  I would have a difficulty. . . .

[Defense counsel then asked for the prospective juror at issue and one other prospective juror to be excused]

THE COURT:  [Prosecutor], your position with regard to the challenge?

[PROSECUTOR[3]]:  Your honor, I oppose the challenge.  I would request an ability to ask some additional questions of the two jurors.  I'm a little unclear as to what their responses

---

[3] The speaker is identified as defense counsel in the trial transcript; in context, however, it is clear that the person speaking was the prosecutor, not defense counsel.

were and the ability or the willingness of them to follow the law.

THE COURT:  You may question each of these jurors for the purposes of making a record toward challenging for cause.

PROSECUTOR:  So I'll pick on Ms. [Juror] first . . . .

So, what we're trying to get the core answer that I think everyone needs to know in this system is this:  The judge is going to give you at the conclusion of the case, a whole bunch of instructions.  And contained within those instructions is the law.  He will read to you, [t]his is the law.  Will you be able to follow that law, even though you think maybe it should be different?  Does that make sense?  Am I asking the question in a way that makes sense?

THE JUROR:  It kind of does, but, no, I'm missing something.

PROSECUTOR:  Okay.  Judge DeSanto is going to read to you the law.

THE JUROR:  Um-hum.

PROSECUTOR:  And your requirement as a juror, even no matter what you think of that law, is that you have to follow it.  You have to look at that law, we're going to give it to you on a piece of paper, you'll be able to read it, you'll be able to think about it and apply it.  Will you follow that law?

THE JUROR:  Well, yeah, I would follow that.

PROSECUTOR:  Okay.

THE JUROR:  However, I don't know that I could, you know, I don't know the right word to use, let it not interfere with my perception of what just happened.

PROSECUTOR:  Sure.  And I think the tough part with this question is that we as individuals, as human beings, cannot ever 100 percent guarantee anything, right?  Would you agree with that?

THE JUROR:  I agree.

PROSECUTOR:  But what I think I hear you saying is you would do your best to follow the law no matter what your individual feelings may be on the subject?

THE JUROR:  To follow the law, yes.

PROSECUTOR:  To apply — sorry to interrupt you.  To apply the law that Judge DeSanto reads in this case, is that?

THE JUROR:  I can do that.  But I cannot guarantee —

PROSECUTOR:  Sure.

THE JUROR:  — that my own individual won't apply.

PROSECUTOR:  But you would do your best as a juror?

THE JUROR:  Definitely. . . .

THE COURT:  If you listen to my original instructions to the whole panel here when you came in here this morning, I've really already given you this law, and I'm going to repeat it for you.

The defendant, that's Mr. Andre Anderson, is presumed innocent.  In order for you to find Mr. Anderson, the defendant, guilty, the State — and I'm going to add the word "alone," the State alone must prove his guilt.  The defendant, Mr. Anderson, does not have to prove his innocence.  The presumption of innocence remains with the defendant unless and until the defendant has been proven guilty beyond a reasonable doubt by evidence admitted in this trial.  You can only base your verdict on evidence that is received during the trial and he is presumed innocent.  Can you follow that law?

[A discussion between the trial court and another prospective juror takes place.]

Ms. [Juror]? . . .  Same question.  That the law that you have heard and that I will give you, perhaps even in a little

expanded fashion if you're a juror on this case at the end of the trial, is the law I've already given you in this regard.

THE JUROR:  Correct.

THE COURT:  And that is that the defendant, Mr. Andre Anderson, is presumed innocent.

THE JUROR:  Um-hum.

THE COURT:  In order for you to find the defendant guilty, the State alone must prove his guilt.  The defendant does not have to prove his innocence.  The presumption of innocence remains with Mr. Anderson, the defendant, unless and until the defendant has been proven guilty beyond a reasonable doubt by evidence admitted in this trial.

Will you follow that law in your deliberation if you're a juror, even if you disagree with it?

THE JUROR:  To the best of my ability.

THE COURT:  All right.  The challenges for cause are respectfully denied.

DEFENSE:  Thank you, Judge.

And respectfully, I'm going to ask the Court if we could reconsider after we had a brief moment at the bar? . . .

[A discussion off-the-record at the bar takes place, followed by a short recess.]

THE COURT:  At the risk of being overbearing, and I'm not trying to be overbearing, can you tell me that you can put aside your own personal opinion about wanting to hear from the defendant and decide the case only on the evidence presented in court, even if it does not include the defendant testifying?

THE JUROR:  Yes.

> THE COURT:  And can you tell me, again, under oath that you can set aside any personal opinion that is different than the law I just read to you earlier and decide the case solely on the facts with other jurors that you decide them to be, and the law precisely as I give it to you, can you do that?
>
> THE JUROR:  Yes.
>
> THE COURT:  You can tell me that under oath.
>
> THE JUROR:  I am telling you that under oath.

Pet. Ex. AA-JJ at 141-45 [ECF No. 3-6].[4]  The prospective juror was empaneled and participated in Anderson's trial.

Anderson argued on direct appeal that the juror demonstrated during voir dire that she could not hear the case without prejudice to his substantial rights and therefore should have been struck for cause.  The Minnesota Court of Appeals, relying on prior opinions of the Minnesota Supreme Court and Minnesota Rule of Criminal Procedure 26.02, reviewed the trial court's decision not to strike the jurors for an abuse of discretion.  *See Anderson*, 2017 WL 1157882, at *2-4.  Using a "two-step process" laid out in earlier state-court opinions — first, did the juror express "actual bias"?  Second, if so, was the juror properly rehabilitated? — the Minnesota Court of Appeals determined that even if the juror's preliminary comments had expressed actual bias regarding Anderson's right not to testify, "she was sufficiently rehabilitated because she 'unequivocally' stated that she would follow the judge's instructions and that she was making that assurance under oath."  *Id*. at *3-4 (quoting *State v. Fraga*, 864 N.W.2d 615, 623 (Minn. 2015)).  In

---

[4] This colloquy, as excerpted, occurs on pages 134 through 150 of the trial transcript. The in-text citation above, and all in-text citations in this Recommendation, are to the document as filed on CM/ECF.

Ground One of his habeas petition, Anderson argues that this finding amounted to an unreasonable application of clearly established federal law.

"Because 'courts presume that a prospective juror is impartial,' establishing juror partiality is a high hurdle." *United States v. Needham*, 852 F.3d 830, 839 (8th Cir. 2017) (quoting *Moran v. Clarke*, 443 F.3d 646, 650 (8th Cir. 2006)). "The standard [is] . . . whether the juror's views would prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath." *Wainwright v. Witt*, 469 U.S. 412, 433 (1985) (quotations omitted). "Essentially, to fail this standard, a juror must profess [her] inability to be impartial and resist any attempt to rehabilitate [her] position." *Needham*, 852 F.3d at 839 (quotation removed).

It was reasonable for the Minnesota Court of Appeals to conclude, on the facts before it, that even if the juror had initially expressed actual bias against Anderson's potential invocation of his constitutional rights, she had been thoroughly rehabilitated of that bias by the end of voir dire. The juror's questioning followed "the usual course of voir dire examination in which a juror expresses some reservations, but upon questioning resolves doubt and asserts that he or she can put preconceptions or prior experiences aside and impartially decide the case based on an open-minded and fair consideration of the applicable law and evidence." *United States v. Mitchell*, 568 F.3d 1147, 1155 (9th Cir. 2009) (J. Thomas, dissenting); *accord Patton v. Yount*, 467 U.S. 1025, 1038-39 (1984) ("The testimony of each of the three challenged jurors is ambiguous and at times contradictory. This is not unusual on voir dire examination . . . ."). The prospective juror began by confessing that she would prefer to hear testimony from the defendant, later

16

vowed to fulfill her obligations to the best of her ability, and concluded by confirming, entirely without vacillation, that she could follow the law as instructed by the judge. Far from resisting rehabilitation, the juror fully acquiesced in it.

Anderson's arguments as to why the refusal to strike the juror for cause amounted to constitutional error are not compelling. First, Anderson points to Minnesota case law stating that "a juror is not rehabilitated if he or she is equivocal when given the opportunity to express his or her sentiments in his or her own words." *State v. Janssen*, No. A17-0194, 2018 WL 1569775, at *2 (Minn. Ct. App. Apr. 2, 2018). Anderson argues that when initially explaining her position, the juror expressed only that she would *try* to follow the judge's instructions regarding the law but might have difficulty doing so. Not until the juror's responses because truncated did her position seem to become unequivocal; had she been invited to expound on her beliefs, argues Anderson, the juror might have reverted to equivocation. But the juror retained the opportunity throughout questioning to express her thoughts however she wished. Never was the juror shepherded towards abbreviated or simplified answers. That the juror's later answers were short, clear, and unequivocal does not mean that she did not have the opportunity to express more complex views; rather, it shows that she had come to fully understand her appropriate role as a juror.

Second, Anderson contends that the juror's responses showing rehabilitation came only in response to leading questions from the prosecutor and trial judge. The Minnesota Supreme Court has found that, when surrounded by equivocal answers, a lone single-word response by a juror to a leading question does not constitute adequate rehabilitation.

*See Fraga*, 864 N.W.2d at 624-25.  This matter differs from *Fraga* in that the juror here did not respond unequivocally *once* that she would follow the law as instructed, but *many* times.  More importantly, though, whether the Minnesota Court of Appeals was mistaken in finding that the rehabilitation questioning was improper under *Fraga* is not the question before the Court, as "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Anderson has not cited (and this Court has not found) any federal case, much less a case from the United States Supreme Court, standing for the proposition that a juror cannot be rehabilitated through the use of leading questions.[5]  *See* 28 U.S.C. § 2254(d)(1).  Indeed, questioning of a far more leading nature than that used during voir dire at Anderson's trial has been found by federal courts to adequately demonstrate juror impartiality.  *See United States v. Sloan*, 492 F.3d 884, 892 & n.3 (7th Cir. 2007) (rejecting claim that the defendant was denied his right to an impartial jury while acknowledging that "[t]he better practice is for the district court to ask non-leading questions when examining a juror for bias.").

Third, Anderson nitpicks the language used by the trial judge while questioning the juror, arguing for example that the judge should have asked whether the juror *would* set aside her preconceived notions, rather than whether she *can* or *could* set aside those

---

[5] The Supreme Court has found that a "trial judge properly may choose to believe those statements that were the most fully articulated or *that appeared to have been least influenced by leading*" in determining whether a juror is capable of serving impartially.  *Patton*, 467 U.S. at 1039 (emphasis added).  This reflects only that the context of a juror's answer may properly be considered by the trial judge in determining the credibility of that juror.  It does not amount to a blanket prohibition on the use of leading questions in conducting voir dire or in confirming the rehabilitation of a juror.

notions.  The distinction borders on the metaphysical.  In context, the juror's answers are clear that she was responding not to the notion that she was capable of following instructions in some abstract sense, but that she would actually do so during the course of the trial.  At the very least, the Minnesota Court of Appeals acted reasonably in concluding as reading the juror's responses as saying as much.

The Minnesota Court of Appeals acted reasonably in denying Anderson's claims of juror bias.  Ground One does not entitle him to habeas relief.

### C.  Ground Two – Photographic Lineups

Victim Johnson was shown a photographic array on August 20, 2014.  Among the pictures used in that array was a booking photograph taken of Anderson in 2011, three years before the crimes at issue.  In the photo, Anderson had no beard and relatively short hair.  *See* Petitioner Exhibit at 4 [ECF No. 43].[6]  Johnson did not identify Anderson (or anyone else) as the culprit during that presentation.

Two days later, Anderson was shown another array.  Anderson's photograph was again included, but this time, the older picture was replaced with a much more recent booking photograph that showed Anderson with a beard and moderate-length hair.  *See* Pet. Ex. L-M at 4 [ECF No. 3-4].  None of the other persons included in the first array were again included in the second, as they had been replaced by pictures of individuals who, like Anderson in 2014, had beards and moderately long hair.  *Id*. at 2-9.  Johnson

---

[6] This Court notes, for sake of clarity within the record, that respondent was twice requested to submit the August 20, 2018 photographic array featuring Anderson.  *See* ECF Nos. 39 & 45.  On both occasions, respondent submitted an array shown by police to Johnson that included the picture of Tim Forrest, not Anderson.  *See* ECF Nos. 40 & 46-2.  The Tim Forrest array is not relevant to Anderson's claim.

this time tabbed Anderson as the offender. That Johnson identified Anderson from the second array was admitted into evidence at trial through Johnson's testimony on direct examination by the prosecution. *See* Pet. Ex. AA-JJ at 190.

Anderson argued before the Minnesota Court of Appeals, as he does in Ground Two of his habeas corpus petition, that the array procedures employed by police were impermissibly suggestive and that the admission of Johnson's pretrial identification violated his due-process rights. Anderson's claim that the second array was impermissibly suggestive rested on three prongs. First, Anderson argued that police should not have shown Johnson two arrays in so short a time with only his picture repeated; it was only natural, claims Anderson, that Johnson would have selected the picture of the person that he had already been shown in the first array, as Johnson would believe the lone repeated person to be the suspect. Second, Anderson argued that the pictures *within* the second array marked him as different; only his photograph did not show his shoulders or torso, and his picture was of a lower quality than the others in the array. Third, Anderson argued that the manner in which the array was presented to Johnson varied in certain respects from policies later implemented by St. Louis County; the procedure was not double-blind (the officers who showed Johnson the second array knew which picture was Anderson's and that Anderson was the suspect), Johnson did not give a physical description of the assailant before the array was shown to him, and Johnson paged through the photographs rather than giving a yes-or-no answer after each photograph was shown individually.

The Minnesota Court of Appeals employed a two-part test in determining whether Johnson's identification of Anderson should have been excluded, consistent with *Simmons v. United States*, 390 U.S. 377, 381 (1968); and *Manson v. Brathwaite*, 432 U.S. 98, 104 (1977). *See Anderson*, 2017 WL 1157882, at *4 (citing *State v. Ostrem*, 535 N.W.2d 916, 921 (Minn. 1995); *accord United States v. Whitewater*, 879 F.3d 289, 291-92 (8th Cir. 2018)). "First, the court consider[ed] whether the procedure unfairly singles a defendant out for identification. Second, even if the procedure was suggestive, the court consider[ed] whether it may be reliable under the totality of circumstances." *Anderson*, 2017 WL 1157882, at *4 (citations omitted).

The appellate court concluded that the procedures employed by police were permissible under each of the two prongs. Although Anderson's picture had been shown in both arrays, the Minnesota Court of Appeals noted (seemingly with approval) that the trial court had found that "the two photos of Anderson were so distinctively different that it was not unduly suggestive." *Id.* There were differences among the photos used in the second array, but "the photos used were of reasonably similar individuals" and "the six photos in the photo lineup were similar enough so as not to be unnecessarily suggestive." *Id.* The procedures employed differed somewhat from the policies later put in place by St. Louis County, but, concluded the Minnesota Court of Appeals, sufficient safeguards were employed to ensure that the procedures were not unduly suggestive:

> [Johnson] was instructed prior to looking at the photo lineups that he did not have to identify anyone, a suspect might not be included in the lineup, and he was not to guess. When [Johnson] did not identify Anderson in the first photo lineup, no attempt was made to encourage him to do so. Although a

21

> double-blind procedure may be the preferred method for
> presenting a photo lineup, nothing in this record reflects that
> the officer showing the photos attempted to influence
> [Johnson].

*Id.*

The Minnesota Court of Appeals then found that even if the lineup had been

impermissibly suggestive, the identification was reliable under the circumstances and

therefore admissible under the second prong:

> [T]he identification of Anderson as [Johnson]'s
> assailant did not rest solely on [Johnson]'s photo
> identification. [Johnson] identified his assailant as
> "Steve's boyfriend." J.H-S. identified "Steve" as
> Hager and said that he had seen Hager with a tall,
> skinny man. Hager's roommates, J.F. and T.F.,
> identified Hager's boyfriend as Anderson, a tall, thin
> man. J.H-S. gave police a phone number that Hager
> used when he contacted J.H-S. on August 20, and that
> phone number was registered to Anderson. Police
> obtained the 2011 booking photo of Anderson based
> on this information. All of this occurred before the
> photo lineup was presented to Johnson. At trial, Hager
> testified that Anderson had stabbed C.J. Under the
> totality of the circumstances, the pretrial photo
> identification was reliable. Therefore, the district court
> did not err by admitting the pretrial identification
> evidence.

*Id.* at *5.

Anderson argues that both conclusions amounted to "an unreasonable application

of . . . clearly established Federal law, as determined by the Supreme Court of the United

States." 28 U.S.C. § 2254(d)(2). This Court agrees. Although the Minnesota Court of

Appeals correctly identified the federal case law controlling on the issues, its application

of that case law was unreasonable.

First, it was unreasonable for the Minnesota Court of Appeals to conclude that the procedures employed by police were not unduly suggestive.  As prohibited by *Simmons* and its progeny, the lineup procedures used to elicit a response from Johnson carried "a very substantial likelihood of irreparable misidentification."  *Simmons*, 390 U.S. at 384; *see also Neil v. Biggers*, 409 U.S. 188, 381 (1972) (citing *Simmons*).  Although "there is nothing per se impermissible about placing the same suspect in two different identification procedures," *United States v. Griffin*, 493 F.3d 856, 865 (7th Cir. 2007) (quotation omitted), the short length of time (two days) between when Johnson was shown the first and second photo arrays, coupled with only Anderson's photograph being repeated in the arrays, was enough by itself to render "very substantial" the likelihood that Anderson would be identified by Johnson as the culprit regardless of whether he had any involvement in the crimes.  *Simmons*, 390 U.S. at 384.  The other irregularities identified by Anderson in the procedures used — that the police giving the arrays knew the identity of the suspect; that Anderson's photograph differed in certain respects from the others in the second array; that Johnson did not provide a description of the culprit before the arrays were presented — further exacerbate that initial, critical error in presenting consecutively the arrays featuring Anderson in so short a period of time.

Also unreasonable was the conclusion of the Minnesota Court of Appeals that Johnson's identification of Anderson was reliable under the totality of the circumstances, even if the procedures used to procure that identification were unduly suggestive.  The Supreme Court has identified "the factors to be considered in evaluating the likelihood of misidentification" as including "the opportunity of the witness to view the criminal at the

23

time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199-200. Each of these factors focuses on the knowledge of the person whose identification of the alleged culprit is being questioned: Did the witness view the perpetrator clearly at the time of the offense? Did the offense occur recently, or might the memory of the witness have eroded before the identification was made? Did the witness describe the criminal prior to the identification? Did the witness demonstrate certainty in his selection?

By contrast, in finding that Johnson's identification of Anderson was reliable under the circumstances, the Minnesota Court of Appeals focused not on whether Johnson would have been likely to identify Anderson's picture regardless of the suggestiveness of the procedures employed by police, but on whether there was reason to believe, *apart* from Johnson's identification, that Anderson committed the crimes. This confuses the *Biggers* inquiry with harmless-error analysis. The Minnesota Court of Appeals might have identified the factors it cited to support a conclusion that admitting Johnson's identification of Anderson, even if erroneous, was not unduly prejudicial, as the jury would inevitably have found Anderson guilty on the strength of other evidence pinning Anderson to the crime. *See, e.g.*, *United States v. Gonzales-Lopez*, 548 U.S. 140, 148 (2006) (noting that "trial error[s] . . . may be quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless beyond a reasonable doubt." (quotation omitted)); *United States v. Sanders*, 708 F.3d 976, 988-89

(7th Cir. 2013) (finding that a supposed error regarding the admission of identification evidence was a trial error subject to harmless-error analysis). But the reasons given by the Minnesota Court of Appeals are not an adequate basis to conclude that Johnson would have been likely to have given an accurate identification of the culprit regardless of the procedures used by the police.

In reviewing whether the rejection of this claim by the Minnesota Court of Appeals "involved an unreasonable application of clearly established federal law," this Court must "review the decision reached in state court proceedings, but not the quality of the reasoning process." *Dansby v. Hobbs*, 766 F.3d 809, 830 (8th Cir. 2014) (citing *Williams v. Roper*, 695 F.3d 825, 833-37 (8th Cir. 2012)); *accord Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). Not only was the *reasoning* of the Minnesota Court of Appeals askew in determining whether Johnson's pretrial identification of Anderson was reliable under the circumstances, but its *conclusion* was unreasonable as well. Recall the factors identified by the Supreme Court as indicating an identification's reliability: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."[7] *Biggers*, 409 U.S. at 199-200. Although not much time passed between the crime and the confrontation, the other factors identified by *Biggers* are either unknown or point strongly in favor of finding Johnson's pretrial

---

[7] Even this factor does not weigh heavily in the government's favor, in light of the unduly suggestive nature of the procedure; coming just two days after Johnson failed to identify Petitioner in a different photo array.

identification to be unreliable. Johnson testified about being under the influence of heroin on the night of the crime. *See* Pet. Ex. AA-JJ at 199. The person who stabbed Johnson was unknown to him prior to the crime and sat behind Johnson during the drive to the location where he was assaulted. The stabber's head and face were obscured with a hood much of the time, including during the assault. The record reflects no expression of confidence made by Johnson about the certainty of his pretrial identification. Very little about Johnson's pretrial identification of Anderson gives reason to believe that the identification was reliable. Moreover, the prosecutor never asked Johnson to make an in-court identification.

Having concluded that the Minnesota Court of Appeals unreasonably held that admission of the pretrial identification made by Johnson was not error, this court must now decide whether the error was harmless. In making that decision, the Supreme Court has directed lower courts considering habeas petitions from state prisoners to apply the standard it adopted in *Kotteakos v. United States*, 328 U.S. 750 (1946) for direct appeals in federal criminal cases. *Brecht v. Abrahamson*, 507 U.S. 619, 639 (1993) (quotation omitted); *see also Fry v. Pilier*, 551 U.S. 112, 116-20 (2007) (finding that *Brecht* standard applies even where state court fails to recognize error by trial court or apply harmless-error analysis). To apply that standard, the habeas court must decide whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 639.

As Justice Stevens observed in his *Brecht* concurrence,

> "The habeas court cannot ask only whether it thinks the petitioner
> would have been convicted even if the constitutional error had not
> taken place. *Kotteakos* is full of warnings to avoid that result. It
> requires a reviewing court to decide that, 'the error did not influence
> the jury' . . . and that, 'the judgment was not substantially swayed by
> the error . . . .'"

*Id*. at 642 (Steven, J, concurring).

Here, the focus of Anderson's trial was the identity of Johnson's assailant. As the
prosecutor observed in opening statement, the question for the jury was, "Who did this?"
(Tr. 253). While defense counsel had an opportunity to highlight the weaknesses of the
identification,[8] in light of the prosecutor's repeated reference to the erroneously admitted
identification in closing argument, this court is unable to conclude that the error did not
have a "substantial and injurious effect or influence in determining the jury's verdict."
*See* Pet. Ex. AA-JJ at 203-06.

Because the court cannot conclude that the admission of Johnson's pretrial
identification did not have a "substantial and injurious effect or influence in determining
the jury's verdict," *Brecht*, 507 U.S. at 639 (quotation omitted), this Court recommends,
that as to the claim set forth in Ground Two, the petition be GRANTED and that
Anderson's judgment and sentence be vacated. This Court further recommends that
Anderson be released unless the State of Minnesota takes affirmative steps to reinstitute a

---

[8] The state argues that it was defense counsel who introduced the faulty evidence and that
any objection to the unreliability of that evidence is therefore waived. But it was the state
that introduced the fact that Johnson had identified Anderson during the second photo
array. *See* Tr. 326-37. Anderson did not waive his objection to the use of that evidence
by attempting to undermine the strength of that evidence at trial.

criminal prosecution within 60 days of the date that his conviction and sentence are vacated.

### D. Ground Three – Rejected Expert Testimony

Both before and during trial, "Anderson moved in limine for permission to call Dr. Ralph Haber, an expert in the psychology of memory and the limitations of eyewitness identification." *Anderson*, 2017 WL 1157882, at \*5. "The district court refused to permit Haber to take the stand, concluding that Haber's testimony would unduly prejudice the State because it would unfairly create an aura of special reliability and trustworthiness for purported expert testimony that is actually nothing more than common sense and common knowledge challenges to eyewitness identification testimony, already available to lay jurors." *Id*. The Minnesota Court of Appeals found that the trial court did not abuse its discretion in excluding Haber's testimony.

In Ground Three of his habeas petition, Anderson argues that the refusal to allow Haber to testify prevented him from putting on a complete defense and thereby infringed his federal constitutional rights. The parties spend most of their briefing on this issue bickering over whether the rejection of the expert testimony was justified as a matter of state law. Because this claim comes before the Court on habeas review, though, Anderson may not be granted relief unless the decision of the Minnesota Court of Appeals "was contrary to, or involved an unreasonable application of, clearly established *Federal* law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (emphasis added); *accord Estelle*, 502 U.S. at 67-68. He cannot. "[E]ven if it is proper to admit expert testimony on eyewitness identification, 'there is no federal

28

authority for the proposition that such testimony *must* be admitted.'" *Williams v. Merkle*,
94 Fed. App'x 562, 564 (9th Cir. 2004) (per curiam) (quoting *United States v. Langford*,
802 F.2d 1176, 1179 (9th Cir. 1986)); *accord Schroeder v. Premo*, 712 Fed. App'x 638,
641 (9th Cir. 2017) (per curiam); *Thomas v. Heidle*, 615 Fed. App'x 271, 282-83
(6th Cir. 2015) (collecting cases and noting that "the Supreme Court has not announced
any clearly established law that would license us to grant habeas relief here even if we
detected the kind of error that would merit reversal on direct appeal.").

Because Anderson cannot demonstrate that the rejection of the proffered expert
testimony amounted to a violation of "clearly established Federal law, as determined by
the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), Ground Three must be
denied.

### E. Ground Four –Evidence of Plea Negotiations

Prior to Anderson's trial, Hager pleaded guilty to arson, aiding and abetting arson,
and aggravated robbery resulting from his participation in the events at issue. During
cross-examination, Hager was asked extensively about the details of his plea agreement.
*See* Pet. Ex. LL-QQ at 52-60 [ECF No. 3-9].[9] Anderson also sought admission of
documents related to the *negotiations* of that plea agreement, contending that those
materials tended to show further that Hager had been incented by the government to
testify against him. The trial court, acting pursuant to Rule 410 of the Minnesota Rules

---

[9] This questioning takes place approximately on pages 998-1030 of the trial transcript;
discussion of the plea agreement is intermittently broken up and eventually trails into
questioning about Hager's version of events, rather than questioning about the plea
agreement itself.

of Evidence,[10] prohibited the introduction of documents related to plea negotiations. *See*

Pet Ex. KK at 9-10 [ECF No. 3-7].[11]  The Minnesota Court of Appeals determined that

"[t]he district court did not abuse its discretion by refusing to permit Hager to be

impeached with evidence of prior, rejected plea negotiations." *Anderson*, 2017

WL 1157882, at *7.  In Ground Four of the habeas petition, Anderson argues that the

exclusion of evidence related to plea negotiations violated his constitutional right to due

process by inhibiting his ability to put on a full defense.

      "In the habeas context, 'questions regarding admissibility of evidence are matters

of state law.'" *Garcia v. Mathes*, 474 F.3d 1014, 1017 (8th Cir. 2007) (quoting *Rousan v.*

*Roper*, 436 F.3d 951, 958 (8th Cir. 2006)).  Errors purely of state law are not cognizable

on federal habeas corpus review.  *See, e.g.*, *King v. Kelley*, 797 F.3d 508, 512 (8th Cir.

2015).  "A federal issue is raised only where trial errors infringe on a specific

constitutional protection or are so prejudicial as to amount to a denial of due process."

*Bucklew v. Luebbers*, 436 F.3d 1010, 1018 (8th Cir. 2006)  Put another way, Anderson

many not bring federal habeas claims alleging that exclusion of evidence related to plea

negotiations was not required under Minnesota Rule of Evidence 410 or that the

---

[10] "Evidence of a plea of guilty, later withdrawn, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged or any other crime or of statements made in connection with any of the foregoing pleas or offers, is not admissible in any civil, criminal, or administrative action, case, or proceeding whether offered for or against the person who made the plea or offer."

[11] The trial court's core ruling is found on pages 598-600 of the trial transcript; additional discussion is found on the pages immediately before and after.

exclusion was otherwise contrary to state law; he must instead show that the exclusion amounted to a violation of his federal constitutional rights.[12]

"While the Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006). Judges may reasonably exclude evidence "that is only marginally relevant to the defense." *Miles v. Minnesota*, No. 08-CV-1174 (PJS/SRN), 2008 WL 2967342, at *4 (D. Minn. July 25, 2008) (citing *Holmes*, 547 U.S. at 326-27).

Here, Anderson contends that the evidence of Hager's prior plea negotiations was essential to establishing that Hager had specific incentives to testify against him — *i.e.*, that he had agreed to offer testimony against Anderson in return for a lighter sentence.

---

[12] Anderson also suggests in his habeas petition — and more directly argues in the memorandum supporting that habeas petition — that the prosecution acted in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), by failing to provide documents related to Hager's plea negotiations to the defense. Anderson did not mention *Brady* or *Giglio*, or even so much as hint at a claim related to *Brady* or *Giglio*, in his petition for review to the Minnesota Supreme Court. *See* Resp. Addendum Ex. 11 at 5 [ECF No. 30-11]. Anderson instead focused on whether the disputed documents should have been *admitted into evidence*, not whether the documents were *withheld from the defense*. *Id.* Because the *Brady* and *Giglio* claims were not fairly presented to the highest available state court, Anderson has not fully exhausted state remedies with respect to those claims. *See* 28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Further, because the *Brady* and *Giglio* claims could have been raised on direct appeal, Anderson may not now renew the claims in state court, *see State v. Knaffla*, 243 N.W.2d 737, 741 (Minn. 1976), and the claims are now procedurally defaulted.

But Anderson had *rejected* these alleged offers; it is therefore unclear why the materials related to those negotiations would have been relevant to Anderson's defense. Moreover, notwithstanding the rejection of evidence related to the plea negotiations, Hager's credibility was exhaustively called into question, with the terms of the *actual* plea agreement — including Hager's obligation to provide an accounting of the events at issue on behalf of the government — forming a critical component of that questioning. *See* Pet. Ex. LL-QQ at 52-59. Anderson was not prevented from exploring this avenue of impeachment before the jury.[13]

The trial court's exclusion of proffered evidence regarding plea negotiations did not rise to the level of a federal constitutional violation. The court rejects Ground Four.

### F. Ground Five – Recall of Witness Hager

The prosecution called Hager — the lone witness at the scene of the crime, apart from the victim and culprit — to testify on day three of Anderson's trial. *See* Pet. Ex. KK at 38-46.[14] After confirming to the prosecutor that he was "very unhappy" to be answering questions, *id*. at 38, Hager testified that he had pleaded guilty to arson, aiding and abetting arson, and aiding and abetting aggravated robbery in connection with the events surrounding the stabbing of Johnson; that he would not receive a further reduced

---

[13] Hager also contends that the trial court erred in failing to grant the government's motion for a mistrial after the defense counsel alluded to plea-negotiation materials in her opening statement. If error at all, the decision not to declare a mistrial was surely harmless to Anderson, as the statement (if it had any effect at all) tended to *overstate* the degree to which Hager had agreed to cooperate in Anderson's prosecution and thus called Hager's credibility into question perhaps to a greater extent than warranted.

[14] The initial questioning of Hager is recorded on pages 714-46 of the trial transcript.

sentence in return for testifying; and that, in fact, he could be punished for testifying insofar as he might be labeled a "snitch" by fellow prisoners. *Id.* Despite his fears, Hager initially answered several questions related to his relationships with Anderson and Johnson and about his life circumstances on the date of the crime. *Id.* at 38-44. Hager also provided a narrative description of what occurred on the date of the crime until he and Anderson entered Johnson's truck prior to the stabbing. *Id.* at 44-45.

Shortly into the questioning, however, Hager declared "I can't do it. I'm sorry" and "I cannot testify. I won't. I'm just saying, I'll do contempt. I'll do it. Take me in contempt." *Id.* at 45-46. Hager remained intransient despite prodding from the trial court, and questioning of Hager concluded for the day. *Id.* at 46.

The next day, Hager returned to the witness stand, said he had "found God," and declared that, after further contemplation, he had decided to continue his testimony. Pet. Ex. LL-QQ at 42.[15] This time, Hager fully answered the questions presented both by the government on direct examination and by the defense under cross-examination. Hager's testimony unequivocally connected Anderson to the crimes.

In Ground Five of his habeas petition, Anderson contends that permitting the prosecution to recall Hager as a witness violated his "due process rights to a fair trial." Petition at 19. Anderson also alleges that the trial judge contacted the public defender who represented Hager during his criminal proceedings and prompted the attorney to

---

[15] The second round of questioning is recorded on pages 956-1040 of the trial transcript; this testimony also spilled into a third day, which is recorded on pages 1077-1121.

urge Hager to take the stand. *Id.* at 20. This judicial involvement, argues Anderson, further abrogated his federal constitutional rights.

Anderson airily invokes the federal constitution's protection of due process as the basis for his claim, but nothing more specific than "due process" is referred to by Anderson in support of the principle that the prosecution may not recall a witness who refuses to testify upon initial calling. Never has the Supreme Court — nor, so far as this Court can tell, any other court — held that recall of a recalcitrant witness infringes on a criminal defendant's constitutional rights.[16] Nor has Anderson cited federal case law for the proposition that judicial involvement of the kind alleged infringes on a criminal defendant's constitutional rights. Obviously, then, Anderson cannot show that the denial of this claim by the Minnesota courts "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The ancillary concerns raised by Anderson regarding Hager's recall are similarly meritless. Far from "stall[ing] trial" as Anderson contends, Petition at 20, the prosecution continued its questioning of other witnesses while Hager brooded on his options, and

---

[16] Anderson did cite on direct appeal an ancient Minnesota Supreme Court case, *Merriam v. Ames*, 4 N.W. 620 (Minn. 1880), "for the proposition that the court may not recall a witness." *Anderson*, 2017 WL 1157882, at *7. As the Minnesota Court of Appeals correctly noted, however, *Merriam* is inapposite; that decision found only that a district court did not abuse its discretion by refusing to permit recall of a witness who had already offered the testimony sought to be introduced by the party seeking recall. *Merriam*, 4 N.W. at 620. Any testimony offered by the recalled witness therefore would have been wholly duplicative. Here, Hager cut off questioning before he had offered testimony on anything other than background events. Far from being duplicative, Hager's testimony after being recalled was essential to the government's case — which, of course, is why Anderson did not want him returned to the stand.

Hager was far from the last of the last of the witnesses called by the government; it is doubtful that Hager's initial obduracy added anything more than negligible delay to the proceedings. Anderson also complains that Hager "was pressured and forced by the court as well as the state to retake the stand," Petition at 20, which is undeniably true. Hager was, after all, threatened with contempt for refusing to testify, and the sole purpose of that threat was to elicit further testimony from him. But "[t]here can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt. And it is essential that courts be able to compel the appearance and testimony of witnesses." *Shillitani v. United States*, 384 U.S. 364, 370 (1966) (citations omitted).

Anderson's claims regarding Hager's recall to the witness stand are entirely without merit. Ground Five should be denied.

### G. Ground Six – Denial of Motion for Judgment of Acquittal

Anderson moved for a judgment of acquittal at the close of the government's case, contending that the evidence admitted was insufficient to establish his guilt. *See* Pet. Ex. LL-QQ at 234-36.[17] The trial court denied the motion, finding that the evidence was "sufficient for a jury to make a decision of whether there is proof beyond a reasonable doubt that" Anderson had committed the crimes charged. *Id.* at 236. In supporting that denial, the trial court pointed specifically to the testimony of Johnson and Hager as grounds upon which a reasonable jury could conclude that Anderson was guilty. *Id.* Anderson contested the denial of his motion for a judgment of acquittal in a pro se

---

[17] The defense's motion and subsequent denial are recorded on pages 1721-30 of the trial transcript.

supplementary appellate brief, but the Minnesota Court of Appeals made short work of

the challenge, concluding tersely that, "[b]ased on our review of the record, the district

court did not err by denying Anderson's motion for a judgment of acquittal." *Anderson*,

2017 WL 1157882, at *7.

In Ground Six, Anderson contends that the denial of his motion for acquittal was

erroneous. *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979) ("[I]n a challenge to a state

criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas

corpus relief if it is found that upon the record evidence adduced at the trial no rational

trier of fact could have found proof of guilt beyond a reasonable doubt."). Habeas claims

based on the alleged insufficiency of the evidence introduced at trial "face a high bar in

federal habeas proceedings because they are subject to two layers of judicial deference."

*Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam). "First, on direct appeal, 'it

is the responsibility of the jury — not the court — to decide what conclusions should be

drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict

on the ground of insufficient evidence only if no rational trier of fact could have agreed

with the jury.'" *Id.* (quoting *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam)).

"And second, on habeas review, 'a federal court may not overturn a state court decision

rejecting a sufficiency of the evidence challenge simply because the federal court

disagrees with the state court. The federal court instead may do so only if the state court

decision was objectively unreasonable.'" *Ibid.*

Anderson has failed to meet this high bar. That the jury perhaps could have drawn

different conclusions from the evidence admitted, or that different factfinders might have

rejected the testimony offered by certain of the witnesses as lacking credibility, does not render objectively unreasonable the state courts' conclusion that sufficient evidence to convict had been admitted. Rather, the trial court reasonably concluded that questions about Johnson's and Hager's credibility and the like were within the domain of the jury to decide, and that, when reviewed in the light most favorable to the prosecution, the evidence admitted at trial was sufficient to support a guilty verdict. This Court agrees. Ground Six should be denied.

### H. Conclusion

Based on the foregoing, the court rejects all of Petitioner's claims except for Ground Two. The court concludes that Petitioner's state court conviction involved "an unreasonable application of clearly established Federal Law as determined by the Supreme Court of the United States", as set forth in Ground Two of his habeas petition. As the court further concludes that the error was not harmless, it is recommended that his habeas petition be granted.

Only one matter merits further comment: A habeas corpus petitioner proceeding under § 2254 cannot appeal an adverse ruling on his petition unless he is granted a certificate of appealability ("COA"). *See* 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA cannot be granted unless the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). This Court recommends granting Anderson's petition based

on the claim raised in Ground Two and further recommends denial of the remaining claims. As to the *denied* claims, this Court does not believe that Anderson has made a substantial showing of the denial of a constitutional right. Accordingly, it is recommended that a COA be denied as to the denied claims.

RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY RECOMMENDED THAT:

1.    The petition for a writ of habeas corpus of petitioner Andre Verlin Anderson [ECF No. 1] be GRANTED on the basis of Ground Two of the petition.

2.    The judgment and sentence in *State of Minnesota v. Andre Verlin Anderson*, Case No. 69DU-CR-14-2925, St. Louis County District Court, be VACATED.

3.    Anderson be released unless the State of Minnesota takes affirmative steps to reinstitute a criminal prosecution within sixty days.

4.    Grounds One, Three, Four, Five, and Six of the petition be DENIED.

5.    No certificate of appealability be issued on the denied claims.

Dated: August 9, 2018                              *s/Franklin L. Noel*
                                                   Franklin L. Noel
                                                   United States Magistrate Judge

**NOTICE**

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).