UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
No. 17-CV-4480 (WMW/FLN)

| | | |
|---|---|---|
| Andre Verlin Anderson, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | **Petitioner's Notice of Appeal and Motion** |
| vs. | ) | **Requesting a Certificate of Appealability** |
| | ) | **with the Eighth Circuit** |
| Vicki Janssen, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

Andre Anderson was convicted of various charges stemming from an alleged assault of Chad Johnson. At trial, the prosecution showed that Johnson identified Anderson as his assailant from a photographic lineup. This lineup violated Anderson's due-process rights because it was impermissibly suggestive and resulted in an unreliable identification. The magistrate judge correctly concluded that the Minnesota Court of Appeals' decision to the contrary was an unreasonable application of clearly established federal law under § 2254(d)(1) and recommended that Mr. Johnson's conviction be vacated. The district court ultimately disagreed with the magistrate judge, rejected the R&R, and denied Mr. Anderson's writ of habeas corpus. Mr. Anderson appeals that decision and the district court's later order denying his motion for a certificate of appealability (COA). He respectfully requests that this Court issue a COA so that he may appeal the district court's adverse judgment. *See Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997).

To grant a COA, a court must find that a habeas petitioner has made a "substantial showing of the denial of a federal constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). This showing is met when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Id.* at 484 (internal quotation marks omitted). When the magistrate and district court's opinions differ as to whether to issue habeas relief, a petitioner "has made the necessary showing . . . for a certificate of appealability to issue." *Lomholt v. Burt*, 219 F. Supp. 2d 977, 1001 (N.D. Iowa 2002). That is precisely what has occurred in the present case: the magistrate judge recommended that Mr. Anderson's petition be granted based on the photo-lineup issue and the district judge rejected this recommendation and denied the petition. Because two reasonable jurists have in fact disagreed over how to resolve the petition, Mr. Anderson has exceeded the showing necessary to issue a COA: namely, that jurists of reason could debate the district court's decision to deny his petition. This Court should therefore issue a COA.

**FACTS**

On the night of August 19, 2014, on a dark rural road in St. Louis County, Minnesota, Chad Johnson was stabbed. (Trial T. at 312-15, 364-65.) He later recounted to the police that he had received a phone call from a friend, Steve Hager, who had asked him for a ride. (*Id.* at 301.) Even though he was high on heroin, Johnson agreed to provide the ride. He picked up Steve Hager and his friend, a man Johnson did not know,

2

on the side of the road in Duluth. (*Id.* at 302, 348, 357-58.) Hager sat in the front

passenger seat, his friend sat in the backseat of the pick-up. (*Id.* at 305.) Johnson had

never seen Hager's friend before. (*Id.* at 303-04, 359.) Johnson followed driving

directions and drove to rural Hicken Road where they pulled over to search for a lost

cigarette pack that contained heroin. (*Id.* at 307-11, 361.) There were no streetlights and it

was a dark, wet, and foggy night. (*Id.* at 310, 369-70.) As the men searched for the

package, suddenly Hager's friend jumped on Johnson's back and began stabbing him.

(*Id.* at 312, 364-65.) Johnson was able to run away and call for help. (*Id.* at 315-18, 321,

345-46.) Although Johnson testified at trial more than two years after the assault that he

saw the face of his attacker, he did not tell the police that when interviewed after the

assault. (*Id.* at 326-27, 349-55, 480.) When questioned about the incident, the police did

not ask Johnson to describe the unknown man who attacked him. (April 19, 2015 T. at

22-23; March 18, 2015 T. at 19, 42-44, 47-49, 92-95.) Johnson did not provide any

description of the man who assaulted him to the police dispatcher, the responding officer,

or the investigating officer who interviewed him at the hospital. (Trial T. at 281-88, 349-

55, 366-67, 480).

During the course of the investigation, the investigators developed two suspects.

The first was the Petitioner, Andre Anderson. The second was Tim Forrest, described as

Steve Hager's lover. Investigator Claire Olson created two photo lineups, one including a

picture of Anderson, the other including a picture of Forrest. (*Id.* at 371-91.) The photo

used in the Anderson lineup was a three-year-old booking photo obtained from the

Minnesota Bureau of Criminal Apprehension's Registry of Arrested Persons (MRAP).

(March 18, 2015 T. at 41.) The investigator needed to choose five additional photos to complete the lineup but had no description of the attacker. Instead she used the MRAP program to try and find persons similar in appearance to Anderson's photo. (*Id.* at 37, 69.) The lineup was compiled and shown to Johnson. (Trial T. at 371-77.) He did not identify anyone in the lineup as the man who had assaulted him. (*Id.* at 377-80).

Later that day, Johnson was shown additional photo lineups. One contained a photo of Steve Hager. (*Id.* at 383.) Johnson identified Hager by drawing a circle around the entire picture and writing, "This is Steve", and then signing his name. (*Id.* at 383-84).

After Petitioner Anderson was arrested, another booking photo was taken of him. At the time of his arrest he had a full beard and longer hair. Because his appearance differed from the photo used in the first lineup, a revised lineup was made using the new booking photo and five additional "filler" photos. (*Id.* at 1425-28.) As in the first photo lineup, the filler photos in the second lineup were not based on a physical description of the assailant but rather based on Mr. Anderson's appearance. Since the purpose of a photo lineup is to get at the truth by answering the question *whom did the victim see?*— which is not at all the same question as *whom do the police suspect?*—photo lineups should be built around the victim's description of the attacker and not around who the police suspect was the attacker. Significantly, police conduct in this case helped make building a lineup around the victim's description impossible because the police never asked Johnson to describe his attacker and Johnson never volunteered the information unprompted. (March 18, 2015 T. at 43.) Moreover, Mr. Anderson's photo stood out from the filler photos because it differed in noticeable ways from them. It was taken at closer

range and in different lighting, thus making him seem more pronounced in the photo. In addition, he was the only person who appeared in both lineups.

The second photo lineup suffered not only from a problematic construction, but also from a problematic administration. Johnson was allowed to look through the stack of six photos and then return to the photo of Petitioner Anderson. (Trial T. at 386-88.) Johnson identified Anderson as the man who assaulted him. (*Id.* at 388-90.) Johnson circled the very small number two underneath the picture of Anderson and signed his name. (*Id.*)  Johnson did not write, as he had with Hager's photo, any words indicating that the person in the selected picture had been the one who stabbed him, nor did he indicate any level of certainty in his identification. (*Id.* at 388, 390-91.) Despite having a tape recorder with him, the investigator did not record the identification procedure. (*Id.* at 390).

It was not until after Johnson identified Anderson in the second photo lineup that the police finally asked him the most basic of questions: describe your assailant. (*Id.* at 399.) Johnson described the man as white, with facial hair, though he was unsure as to whether that included a mustache. He gave no indication regarding height, weight, build, hair length or color. (*Id.* at 401-02.) He further indicated that when looking at the most recent photo lineup (including Mr. Anderson) he did "choose one that I *believed* to be him," hardly a statement expressing certainty—let alone certainty beyond a reasonable doubt—or inspiring confidence. (*Id.* at 1598-99) (emphasis added.)

During the trial, accomplice Hager testified that Petitioner Anderson was the person who assaulted Johnson. Johnson did not make an in-court identification of

Petitioner Anderson as his assailant but testified that the man with Hager was bearded, dark-haired, about six feet tall, and skinny. (*Id.* at 306.) The State elicited testimony from multiple officers and Johnson about Johnson's out-of-court identification of Petitioner Anderson. This out-of-court identification was used to corroborate Hager's accomplice testimony.

No blood, DNA or fingerprints were detected on the recovered knife. (*Id.* at 818-19, 950.) No forensic evidence connected the knife to Petitioner Anderson. (*Id.* at 818-19, 954.) No forensic evidence was presented by the state that incriminated the Petitioner.

The jury found Petitioner guilty.

## ARGUMENT

**This Court should issue a COA so that it can review the question whether the photographic lineup used to identify Mr. Anderson was impermissibly suggestive and resulted in an unreliable identification that violated his due process rights.**

### A.   *Legal standard for issuing a COA*

In order to appeal the denial of his federal habeas petition, Mr. Anderson must obtain a certificate of appealability from a district or circuit judge. *See* U.S.C. § 2253(c). For a court to issue a COA, "a habeas prisoner must make a substantial showing of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000); *accord* 28 U.S.C. § 2253(c); *see also* Fed. R. App. P. 22(b)(1). This showing is met if the habeas petitioner can show that "reasonable jurists *could debate* whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v.*

*McDaniel*, 529 U.S. at 484 (internal quotation marks omitted) (emphasis added). "The standard demands modesty: Courts must acknowledge when they have ruled on a difficult issue that deserve[s] encouragement to proceed further." *Sanders v. White*, 2017 U.S. Dist. LEXIS 74002 at *7 (E.D. Ky., May 16, 2017) (quoting *Slack*, 529 U.S. at 484) (internal citation and quotation marks omitted).

Disagreement between the magistrate's R&R regarding habeas relief and the district court's ultimate order on the petition has been found to constitute "a substantial showing of the denial of a constitutional right" that merits issuing a COA. In the Eastern District of Missouri, for example, a magistrate judge issued a R&R recommending that a writ of habeas corpus be granted as to a petitioner's claim that appellate counsel was ineffective for failing to raise a change-of-venue issue on appeal. *Matthews v. Purkett*, 2009 U.S. Dist. LEXIS 83497 at *1 (E.D. Mo., Sept. 14, 2009). The district court ultimately found that "appellate counsel was not ineffective for failing to raise the issue on appeal" and declined to grant habeas relief. *Id*. at 27-31. Still, the court issued a COA because:

> Although the Court finds that habeas relief is not warranted, the Court recognizes that the resolution of petitioner's ineffective assistance of counsel claims . . . could potentially be debatable among reasonable jurists such that a certificate of appealability should issue on that issue alone. Indeed, *the issue has already been resolved differently by different jurists*. . . . The magistrate judge, for whom the Court holds much respect, concluded that petitioner was denied effective assistance of appellate counsel. *Clearly, the issue is one that is debatable among reasonable jurists*.

*Id*. at 31-32 (internal citations and quotations omitted) (emphasis added). Thus when a magistrate judge's R&R is not adopted by the district court, "the issue has

already been resolved differently by different jurists" and a COA must issue. *See id*.

Also important here is that the COA inquiry "is not coextensive with a merits analysis." *Buck v. Davis*, 137 S. Ct. 759, 773 (2017). "At the COA stage, the *only* question is whether the applicant has shown that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Id*. at 327 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)) (internal quotations omitted) (emphasis added). This threshold question must be decided without "full consideration of the factual or legal bases adduced in support of the claims." *Id*. at 336.

Instead of recognizing that a reasonable jurist had already disagreed with its decision—a showing that exceeds the legal standard necessary to obtain a COA, which requires only that reasonable jurists *could debate* whether the petition should have been resolved differently—the district court concluded that "[i]n light of the well-established standard of review, as applied in the Court's February 21, 2019 Order, no reasonable jurist would find this Court's assessment of Anderson's constitutional claims to be either debatable or wrong." (DE 68.) But the record belies this conclusion: because reasonable jurists have disagreed about whether to grant his petition, Mr. Anderson has exceeded the necessary showing that jurists of reason *could debate* the district court's decision to deny his petition. *See, e.g., Lomholt v. Burt*, 219 F. Supp. 2d 977, 1001 (N.D. Iowa 2002) ("The Court finds that [the petitioner] has made the necessary showing here for a certificate of appealability to issue in this case, not least because of the difference in

opinion on the key issues between [the magistrate judge] and the [district court]"). As shown next, reasonable jurists could reach a different conclusion than the district court did here as to whether the photographic lineup used to identify Mr. Anderson violated his due-process rights because it was impermissibly suggestive and resulted in an unreliable identification. This Court should therefore issue a COA and allow an appeal.

**B.      *Mr. Anderson's due process rights were violated when the prosecution introduced an impermissibly suggestive lineup that resulted in an unreliable identification.***

In *Stovall v. Denno*, 388 U.S. 293 (1967), the Supreme Court made clear that the prosecution can violate a criminal defendant's due-process rights by introducing identification evidence at his or her trial which derives from impermissibly suggestive identification procedures. Refining this rule, the Supreme Court later pinpointed precisely when a defendant's due-process rights are violated: when the suggestive procedures result in the likelihood of misidentification. *Neil*, 409 U.S. at 198. So a two-part analysis is used in determining whether the constitution requires excluding the identification evidence. First, a court must decide whether an identification was in fact the product of an impermissibly suggestive procedure. *See Neil*, 409 U.S. at 198-99. If the answer to this first inquiry is yes, a court must then consider whether the resulting identification is nonetheless reliable enough to permit its introduction at trial, using the following factors: the witness's opportunity to view the suspect; the witness's degree of attention during the crime; the accuracy of the witness's description before the identification; the witness's

9

level of certainty about the identification; and, the length of time elapsed between crime and confrontation. *Id.* at 199-200.

The Minnesota Court of Appeals found that sufficient safeguards were employed to ensure that the identification procedures were not unduly suggestive and that even if they were impermissibly suggestive, the identification was nonetheless reliable under the circumstances. As the magistrate judge found, both conclusions amounted to "an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(2), because the lineup procedures carried "a very substantial likelihood of irreparable misidentification" and that "[v]ery little about Johnson's pretrial identification of Anderson gives reason to believe that the identification was reliable." (DE 59 at 23-26.) Both criteria under *Neil* are met here; certainly the matter is fairly debatable such that a COA is appropriate and necessary.

1.    *The photographic lineup used to identify Mr. Anderson was impermissibly and needlessly suggestive. The Minnesota Court of Appeals decision to the contrary was an unreasonable application of clearly established federal law.*

The photographic lineup containing Mr. Anderson that produced a positive identification from Johnson—which was the second lineup shown to Johnson that contained Mr. Anderson[1]—suffers from myriad problems including the following:

- Because the officers presenting both lineups knew that Anderson was the suspect and knew which picture was Anderson's, they could have unconsciously

_____

[1] This eight-page photographic lineup can be found in color at Docket Entry (DE) 46-3.

communicated this to Johnson. (March 2015 T. at 123-25; April 2015 T. at 21.[2])
Moreover, the officers never attempted to find an officer to present the lineups
who was not so tainted. (March, 2015 T. at 45, 97-99; *see id.* at 1-127; April, 2015
at 1-38.)

- Only one officer involved in creating or presenting the lineups had any formal
  training on these skills. (March, 2015 T. at 33, 67-68, 83-84; April, 2015 T. at 5,
  17-18.) His "training" makes the crucial second lineup more suspect, not less.
  Steven Borchers, who was involved in presenting the second lineup, was trained
  that it is better if the officer presenting the lineup knows which photo is the
  suspect's. (March, 2015 T. at 104-06, 111, 113-14, 123-125.)

- The St. Louis County Sheriff's Department had no written policy or procedure
  governing or even advising how lineups were to be created or presented to a
  witness. (*Id.* at 39, 69, 84, 88, 106; April, 2015 T. at 12, 17-18.)

- There were numerous other deviations from best practices for photo lineups. *See*
  The Innocence Project's webpage *Eyewitness Identification Reform*, available at
  https://www.innocenceproject.org/eyewitness-identification-reform/. The
  Innocence Project found that "[m]istaken eyewitness identifications contributed to
  approximately 71% of the more than 350 wrongful convictions in the United
  States overturned by post-conviction DNA evidence." *Id.* Many flaws the
  Innocence Project highlights exist in this case. For example, the lineup procedure
  was not recorded, even though Brent Donahue, who presented the second lineup,
  had a tape recorder. (April, 2015 T. at 12.) Also, Johnson did not say how
  confident he was in his identification, and Donahue did not ask. (*Id.* at 14.)

- The officers never asked Johnson to describe his assailant before they presented
  the two lineups. (*Id.* at 22-23); (March, 2015 T. at 18-19, 42-44, 47-49, 93-94; *see
  id.* at 9-12.) Donahue—the "sergeant that oversees investigations" for the St. Louis
  County Sheriff's Department (April, 2015 T. at 5)—testified that he did not ask
  Johnson what his assailant looked like, and that it would surprise him and be out
  of the ordinary if no officers had asked Johnson what his assailant looked like (*id.*
  at 23.) And yet the basic police work of asking the victim to describe his assailant
  was not done until after Johnson identified Anderson. (*Id.* at 24.) Only once that
  happened did Donahue turn on the tape recorder and ask Johnson to describe his

---

[2] The March 2015 contested-omnibus-hearing transcript is at pages 7-39 of DE 3-6; the
April 2015 contested-omnibus-hearing transcript, at pages 40-50. I cite to the transcripts'
actual page numbers. (*See* DE 58 at 6 n.2-3.)

assailant: "Did he have any kind of, can you describe his hair or his face or anything of that nature that you can recall?" (Trial T. at 1913; *accord id.* at 1914.) That the investigators delayed these questions until after Johnson identified a suspect through a lineup is extremely troubling. The lineups were never based on Johnson's describing his assailant. It's as if the investigators deliberately avoided asking that basic question because they feared they would not like the answer and wanted to delay the question until after Johnson identified someone through a lineup.

These problems alone are enough to render the second lineup in which Johnson identified Mr. Anderson as his assailant as impermissibly suggestive.

But the most glaring and fundamental problems are revealed through the testimony of the law-enforcement officers themselves. Despite having no policy or even guidance on creating and presenting photo lineups, an unsurprising consensus emerged from the officer's testimony at the omnibus hearing: the purpose or goal of a well-constructed lineup is to have several pictures of individuals who look similar to the suspect so that no particular photograph stands out because that enhances the reliability of the procedure and resulting identification should one be made. (March 18, 2015 T. at 21, 73-74); April 9, 2015 T. at 6, 27, 29.) Phrasing this purpose as choosing photos that are similar to the suspect—as the law-enforcement officers did here—has some problems, but even in this anemic form, the testimony of these officers and the lineup photographs show that they violated this self-imposed goal.

Achieving the goal of what the law-enforcement officers in this case consider a good lineup requires more than just trying to match the types of clothing worn by people whose photographs are used. It also extends to the background of the photo. The photo lineup using Tim Forrest was based on his driver's license photo because he did not have

a booking photo. (*Id.* at 56.) But that photo had a bright blue background and "the other remaining five pictures . . . were clearly not bright blue. They were a gray, different colored background" (*Id.*) So Investigator Voltzke made that photo lineup black and white; failing to do so would make Tim's picture stand out because it had a different background, rendering the lineup impermissibly suggestive even in the eyes of the investigators in this case. (*Id.* at 56-57.)

But as the magistrate concluded in her R&R, the photo used of Mr. Anderson in the second lineup was not extended these very same safeguards. (*See* DE 59 at 23.) Of the six photos used in the second lineup, only Mr. Anderson's photo has no clothes displayed. (*Compare* DE 46-3 at 3, *with* DE 46-3 at 2, 4-7.) The photo is shot from such close proximity that no clothes are visible, only Mr. Anderson's face and a small part of his neck. This is a problem the officers could have fixed. Investigator Voltzke testified that this picture of Mr. Anderson is a booking photograph from the St. Louis County Jail. (March 18, 2015 T. at 47.) And both Investigators Voltzke and Olson testified that the MRAP program's repository of photographs used to construct lineups is made up of "booking photo[s]" from the county jails in Minnesota, which upload their "jail photos from arrests" to this program. (*Id.* at 20, 70.) Since Mr. Anderson's photo is an actual booking photo, and since the MRAP program they use is made up of booking photos, it stands to reason that they could have selected other booking photos that, like Mr. Anderson's, are shot so close up that they don't show any clothing, just the head and neck. That would be equivalent to selecting photos of people wearing orange jail clothes if the suspect is wearing those or civilian clothes if the suspect is wearing those, exactly

as Investigator Olson urged should happen in order to build a good lineup. That it didn't

happen here underscores that the lineup is impermissibly suggestive.

Now consider the background of Mr. Anderson's photo. It is green with orange

and yellow streaks, different from all the other photos. (DE 46-3 at 3.) Photos 1 and 6

have a similar blue/purple background (*compare id.* at 3 *with id.* at 7); photos 3 and 4

have white backgrounds with blue streaks (*compare id.* at 4 *with id.* at 5); photo 5 has a

grayish background with some purple and bluer tinges (*id.* at 6.) None of the other

backgrounds resemble the background of Mr. Anderson's photo, which clearly stands

out. The color issues aren't even limited to the background. Mr. Anderson's photo has a

strong orange/yellow tinge to it throughout: the bottom portion of his neck is red/orange.

The lighting is completely different than every other photograph: its striking character

literally leaps off the page. If the investigators here felt that the needed to make Tim

Forrest's lineup black and white to avoid singling Tim out because of the bright blue

background, then for even stronger reasons they could and should have also made Mr.

Anderson's black and white because the color issues aren't even limited to the

background. But they didn't. This again shows that this lineup is impermissibly

suggestive, even under their standards.

What's worse, the last three problems discussed—failing to find comparator

photos that were also taken at close range and that also did not show any clothing on his

person, failing to make the lineup black and white to fix the colors and lighting that made

Mr. Anderson's photo standout from the others, and delaying asking a basic police

question (describe your attacker?) until after a positive identification has been made from

14

a lineup—all of them are absolutely unnecessary. Police could have found other booking photos that were shot from a distance similar to Mr. Anderson's booking photo. They could have made the lineup black and white instead of in color, as they did for Tim Forrest to ensure that he did not unnecessarily stand out. And they could have asked the victim what his attacker looked like before they began preparing and presenting lineups.

These problems demonstrate that the photo lineup was twice damned: it was not just impermissibly suggestive, but needlessly so: "[s]uggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Neil v. Biggers*, 409 U.S. 188, 198 (1972). Given the myriad of problems plaguing the second lineup, the magistrate judge correctly found that the Minnesota Court of Appeals unreasonably concluded that the procedures employed by the police were not impermissibly suggestive.

2.      *The resulting identification was unreliable. The Minnesota Court of Appeals decision to the contrary was an unreasonable application of clearly established federal law.*

Because the lineup was impermissibly and needlessly suggestive, we must evaluate whether the resulting identification is nonetheless reliable enough to permit its introduction at trial, using the following factors: the witness's opportunity to view the suspect; the witness's degree of attention during the crime; the accuracy of the witness's description before the identification; the witness's level of certainty about the identification; and, the length of time elapsed between crime and confrontation. *Neil*, 409

U.S. at 199-200. The clear answer is no, which the magistrate judge correctly concluded.

The first factor tilts in unreliability's favor because Johnson, who was high on heroin and other drugs during the night of the attack, had a poor opportunity to view his attacker. (DE 58 at 3, 15-18.) It was dark and foggy out; he had never met his attacker before; his initial interaction with his attacker when he picked him up was brief and unremarkable; his attacker sat in the back seat during the drive and did not talk much; the attack "happened really fast"; his back was to his attacker when he was attacked; when he turned around, he "cover[ed himself] up" for protection; there were no streetlights in the area where he was attacked; and his attacker's face was obscured by a black hoodie. (Trial T. at 301-04, 306-08, 310-13, 317, 331, 358-360, 363-64, 369-70, 1905-06, 1908.) That Johnson had a poor opportunity to view his assailant is underscored (1) by his failing to describe his attacker until he had identified him from the second lineup and (2) by the prosecutor's failing to even ask him to identify his attacker in court. (*Id.* at 347, 349-50, 354.)

Moreover, even the recorded statement he gave to police on August 22 immediately after identifying Mr. Anderson as his assailant from the second photo lineup is scant on details about his assailant. Johnson says that he remembers his assailant was wearing a black hoodie; "think[s] he had pants on, blue jeans or something"; and "had a lot of scruff on his face. (Trial T. at 1913.) He then said, "And that's all I can really—" but before he can finish that last word, which is likely the word *remember*, Investigator Borchers interrupts with this: "Scruff being, like a beard-type thing." (*Id.*) Johnson agrees and, in response to a mustache prompt, says that he "think[s]" he had a mustache, but is

not "positive." (*Id.* at 1913-1914.) He can't even say for sure that the assailant was white, just that "[f]rom what I saw he was white." (*Id.* at 1914.) Mr. Anderson's description in the recorded statement—full of its hedges and caveats on significant features—does no more than partially describe the photo he has just chosen, and even then, the partial description is extremely general in nature.

In *Clark v. Caspari*, 274 F.3d 507, 511-12 (8th Cir. 2001), the Eighth Circuit reasoned that the witnesses' inability to provide a detailed description to the police before the suspects were apprehended and difficulty remembering certain details about the suspects at the time of the robbery "undercut the reliability of their testimony, and indicate that they may have been inattentive at the time of the crime and uncertain at the time of their identifications." That same reasoning applies here.

The witnesses' degree of attention during the crime also weighs in favor of concluding that the identification evidence is unreliable. Before the attack, his testimony described above was that there was nothing much remarkable about Steve Hager's companion. Johnson didn't speak much to him. (Trial T. at 307.) During the drive, Johnson and Steve did most of the talking. (*Id.* at 308.) When the attack started, Johnson's "back was totally turned." (*Id.* at 1905.) And when Johnson turned towards his attacker, "I think I was covering myself up when I turned toward him." (*Id.* at 1906.) The attack "all happened really fast." (*Id.* at 1908.) As already discussed, even his description of his attacker after he picked Mr. Anderson out of a photo lineup is short on details and full of caveats and hedges. (*Id.* at 1913-1914.)

17

The third factor—the accuracy of the witness's description before the identification—leans completely in favor of unreliability. As discussed above, Johnson never described his assailant before the identification.

The fourth factor—the witness's certainty about the identification—also favors unreliability. Even given all the myriad ways in which the photo lineup used in this case is impermissibly and needlessly suggestive, and even though the law-enforcement officers do not ask how certain Johnson is of his identification (an omission that in the context of this case could very well be deliberate), Johnson still does not describe his identification with language invoking certainty or confidence. In his recorded statement given immediately after identifying Mr. Anderson, all he musters is this about his choice: "I did choose one that I *believed* to be him." (*Id.* 1915 (emphasis added).)

The final factor, the length of time between the crime and confrontation is the only factor that weighs in favor of reliability. The attack occurred on the night of August 19, 2014, and the second lineup involving Mr. Anderson was presented to Johnson on August 22, 2014.

Because all but one of the critical factors weigh in favor of unreliability, the identification in this case is unreliable and deeply problematic. "Very little about Johnson's pretrial identification of Anderson gives reason to believe that the identification was reliable." (DE 59 at 26.) The magistrate judge was correct in finding that the Minnesota Court of Appeals unreasonably applied clearly established federal law in concluding otherwise.

3.     *Admitting the pretrial identification evidence harmed Mr. Anderson. This Court should grant his motion and vacate his conviction.*

Anderson was harmed by admitting the lineup-based identification. The governing law in *Kotteakos v. United States*, 328 U.S. 750 (1946) and *Brecht v. Abrahamson*, 507 U.S. 619 (1993) makes this plain.

The test is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id*. at 637 (quoting *Kotteakos*, 328 U.S. at 776). Crucially, the "inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence." *Kotteakos*, 328 U.S. at 765. In other words, the harmless-error standard measures the error's impact by looking at its effects on the actual trial, not by asking what would be the result of a hypothetical trial conducted without the error. *Brecht*, 507 U.S. at 642 (Stevens, J., concurring); *Wilson v. Mitchell*, 498 F.3d 491, 503-04 (6th Cir. 2007).

Construing the harmless-error standard in this manner (*actual effect* rather than a *hypothetical-trial result*) means that the relevant question "under the *Brecht/Kotteakos* standard . . . is not the strength of the evidence or the probability of conviction at a hypothetical retrial absent the error"; instead it is "whether the error substantially affected the actual thinking of the jurors or the deliberative processes by which they reached their verdict." 2-31 R. Hertz & J. Liebman, *Federal Habeas Corpus Practice and Procedure* § 31.4d (2017); *accord Yohn v. Love*, 76 F.3d 508, 523 (3d Cir. 1996). *Kotteakos* says the "question is not [whether the jurors] were . . . right in their judgment, regardless of the

error or its effect upon the verdict. It is rather what effect the error had or *reasonably may be taken to have had* upon the jury's decision." *Kotteakos*, 328 U.S. at 764 (emphasis added).

These principles compelled the magistrate to conclude that the erroneous admission of the pretrial identification evidence harmed Mr. Anderson. (DE 59 at 27.) Here, the focus of Mr. Anderson's trial was the identity of Johnson's assailant. The prosecutor flagged this as the central issue early in her opening statement. After recounting that Johnson was stabbed twelve times and describing how serious his injuries were, she stated: "I don't think anybody would . . . argue . . . that Chad Johnson was not seriously injured on August 19, 2018. The question, the debate, the issue that you jurors have to figure out is how that happened? Who did this?" (Trial T. at 253.) Later in her opening she highlighted that the central question facing law-enforcement officers was the identity of the attacker and his accomplice: "you'll hear from law enforcement officers about what they did to try to figure out who was involved in this situation, who stabbed Chad Johnson and who Steve was, who the stranger was." (*Id.* at 257.) Her closing similarly flagged identity as the crucial issue: "We heard testimony that Chad Johnson and Steve Hager and *another person, which is the crux of the issue*, met sometime about 10:30 on August 19 . . . ." (*Id.* at 1802.) In sum, it's beyond dispute that the pretrial identification evidence went to the heart of this case. Because the pretrial identification evidence went to the central issue in the case, and because the prosecutor's own use of the evidence supports the common-sense conclusion that this evidence was extremely probative and important on this issue, the magistrate judge was correct in concluding that

the error had a substantial and injurious effect or influence in determining the jury's verdict, an influence that clearly harmed Mr. Anderson.

As evidenced by the magistrate judge's R&R, Mr. Anderson has shown that his due-process rights were violated when the State introduced identification evidence at his trial which derived from impermissibly suggestive identification procedures. While the district court ultimately declined to adopt the magistrate judge's recommendations, Mr. Anderson has made a substantial showing that reasonable jurists could debate whether his petition could be resolved in a different manner such that this Court must issue a COA.

## CONCLUSION

For all these reasons, Mr. Anderson asks this Court to issue a COA with respect to the issue presented here.[3]

Dated:  March 20, 2019                          Respectfully submitted,


                                                *s/Robert Meyers*

                                                _____
                                                Robert Meyers
                                                Assistant Federal Defender

                                                Kelly L. Nizzari
                                                3L University of Minnesota Law School
                                                Legal Intern

---

[3] Mr. Anderson is represented by the undersigned counsel on only the photo-lineup issue. (DE 47.) He has prepared additional pro se briefing on other issues and respectfully requests that this Court issue him a COA on those issues. That briefing is attached as an exhibit.

U.S. Courthouse, Suite 107
300 South Fourth Street
Minneapolis, MN  55415
612-664-5858

Attorneys for the Appellant